UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ x
:
UNITED STATES OF AMERICA, :
: **ORDER AND OPINION**
Plaintiff, : **DENYING MOTION TO**
: **SUPPRESS STATEMENTS**
-against- :
: 21 Cr. 132 (AKH)
ADAEL ARIEL FIGARO, :
:
Defendants. :
:
------------------------------------------------------------ x

ALVIN K. HELLERSTEIN, U.S.D.J.:

        Defendant Adael Ariel Figaro is charged with one count of conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349; one count of committing wire fraud in violation of 18 U.S.C. § 1343 and 2; and one count of aggravated identity theft in violation of 18 U.S.C. § 1028A and 2. On March 10, 2021, federal agents arrested Figaro at his home. Figaro informed the agents that he had contracted COVID-19. The agents took Figaro to the hospital for testing. At the hospital, FBI Special Agent ("SA") Norton Cordova ("Cordova") advised Figaro of his *Miranda* rights, as witnessed by SA Justin Getz ("Getz") and SA Benjamin Davi ("Davi"). Figaro acknowledged that he understood his rights. Five minutes later, the attending physician issued a Fit for Confinement letter, and Figaro was transported to Homeland Security Investigations New York ("HSI/NY") for arrest processing where SA agents questioned Figaro about his involvement in the charged identity theft scheme. Figaro moves to suppress any oral or written statements made to the FBI during the March 10, 2021 interrogation. Motion to Suppress Statements ("Motion"), ECF No. 90.

1

**RELEVANT FACTS**

Defendant was indicted and arrested for conspiring with seven co-defendants to commit wire fraud, substantive wire fraud, and aggravated identity theft. ECF No. 2. Agents from the Department of Homeland Security – Homeland Security Investigations executed the arrest warrants on March 10, 2021. ECF Nos. 4–11. According to the Arrest Report, *see* Response in Opposition by USA ("Opp."), Ex. A ("Arrest Report"), ECF No. 95-1, the agents arrived at Defendant's residence in Yonkers at approximately 6:05 a.m., and after receiving no response to their knock and announce, they breached the door, entered, and placed Defendant under arrest. *Id.* Defendant informed agents that he had recently tested positive for COVID-19. *Id.*; Motion to Suppress Statements, ECF No. 90, Declaration of Adael Figaro ("Def. Decl."), ¶ 12, ECF No. 91. Agents transported Defendant to the hospital, where after several hours, the emergency room physician issued a letter stating that Defendant was "fit for confinement," confirming that Defendant was "[a]symptomatic" and that "symptoms resolved 2 weeks ago." Opp., Ex. 1. Defendant declares that he was "feeling sick, [] had a headhache, and [] was feeling cold. [He] was very confused about what was going on and could not really focus because [his] headache was very bad. [He] had not eaten anything all day, so [he] was very hungry too." Def. Decl. ¶ 12.

While waiting for Defendant's discharge paperwork at the hospital, Agent Cordova, in the presence of Agents Getz and Davi, issued Defendant his *Miranda* warnings. Arrest Report; Def. Decl. ¶ 13 (stating that "one of the agents read something to [Defendant from a small card"). Agent Cordova recalls that after he read each right, Defendant confirmed that he understood. He recalls that Defendant said something to the effect of "listen, I don't want to talk to you guys until I talk to an attorney." Opp., at 4. Agent Cordova informed Defendant that he

would need to ask him pedigree questions at the HSI office as part of his arrest processing, but otherwise agents did not have any further substantive conversations with Defendant. *Id.*

In his Declaration, Defendant states: "While I was in the hospital, one of the agents read something to me from a small card. After reading the card, the agent did not say anything to me and I did not say anything to the agent." Def. Decl. ¶ 13.

During transport and processing, Defendant attempted to engage nearly every agent with whom he came into contact, repeatedly asking whom he could speak to about the charges against him, why he had been arrested, and whether agents thought that he would be able to go home that day. *Id.* Although the agents informed him that he would need to speak to the case agent, and that a judge would decide whether he would be released on bail, Defendant made clear that he wanted to speak to the case agent, SA Drew Koepsell. *Id.* Shortly after 12:00 pm., Defendant participated in the interview with Agent Koepsell and Agent Getz. *Id.*; *see also* Arrest Report.

In his Declaration, Defendant states: "Once we got inside the building, the agents took me and put me in a holding cell. I kept asking them if I could go home, but the agents never answered me, and I was not released to go home. I was still feeling sick, but I could not focus on that. I was just so afraid that I would not be able to go home." Def. Decl. ¶ 15.

At the beginning of the interview, Agent Koepsell advised Defendant that he would "answer all the questions that [Defendant] had," and stated that "this is going to be the only time we can talk like this, like straight up, back and forth, because after this it gets complicated," adding that Figaro was in "complete control of what happens here today." Recording 1 at 00:42–01:13. Agent Koepsell explained the elements of the charges, noting that wire fraud carries a maximum sentence of twenty years in prison, and urged Defendant to

3

cooperate in the investigation.  Part of this urging included Agent Koepsell telling Defendant that he will "always step up, always go to bat, always bend over backwards twice as hard for anyone that helps me." *Id.* 01:23–01:38.  Agent Koepsell then asked Defendant, "You said you watch *Law & Order*" and further that Defendant "has been arrested plenty of times by the state." Defendant said, "Yeah." *Id.* at 02:54–03:01.

In his Declaration, Defendant states: "The agents in the room told me that they were going to give me a chance to help myself.  They told me that they would be recording our conversation.  One of the agents placed a recording device on the table and turned it on.  The agent told me that he will always work twice as hard to help someone who helps him and that because of that, I should tell him what happened.  He said if someone does not help him or does not cooperate, then he will not help them." Def. Decl. ¶ 17.  He further states: "The agent then told me that it was a federal case and that if I talk to them, I still have a chance to get out of it. The agents told me I was indicted for Wire Fraud, Wire Fraud Conspiracy, and Aggravated Identity Theft.  As the agents were explaining things, I understood that this was a federal indictment, and I was looking at twenty (20) years in jail and that the only way they can help me is if I tell them what I knew.  After hearing that I could spend twenty (20) years in jail, I was terrified.  I started breathing heavily.  They started asking me questions about the charges in the indictment.  They did not give me any papers to sign or read anything from any papers to me the whole time we were in that building." Def. Decl. ¶ 18–19.  Defendant additionally states: "I did not understand that I did not have to answer their questions.  I thought that the only way for me to go home was by answering the agent's questions because whenever I asked the agent if I could go home, he would not answer me.  The agent repeatedly told me that if I cooperate and

4

tell him things, he is the only one that can help me. They continued to ask me questions." Def. Decl. ¶ 20.

Defendant initially claimed that someone had stolen his identity, *id.* at 04:57–05:01, but when Agent Koepsell asked him to talk about "the whole cell deal," Figaro replied, "oh that?" *Id.* at 05:36–05:50. Figaro said, "I'm not gonna lie, I did it, like two or—a couple time, I didn't like it. You know, like, I'd got take a phone. They would give me an account, I'd go . . . ." *Id.* at 06:29–06:49. Defendant then indicated that he had been "locked up," and that he was not involved after he was released. *Id.* 07:10–08:00. "I did something that was dumb but never since." *Id.* at 08:00–08:15.

After Defendant's denials, Agent Koepsell stated that this scheme had been going on a long time, and asked Defendant if he wanted Agent Koepsell to start naming names. *Id.* 08:30–08:42. He further advised Defendant that he had already looked through his phone. *Id.* Agent Koepsell told Defendant to "look at his criminal history. A judge will not look at you favorably. You will do federal prison time." *Id.* at 9:57–10:12. Defendant continued to maintain that his involvement predated his prior arrest. Recording 2 at 0:100–03:30. He then told Agent Koepsell that the person they wanted, Cordova, was dead in the Dominican Republic. *Id.* at 03:50–4:00. Agent Koepsell responded that "just because the head honcho dies doesn't mean that the rest of the honchos down the chain don't go to jail." *Id.* at 04:04–04:12. Defendant reiterated that he never met "the man," and Agent Koepsell stated that he didn't "think you understand the concept that I'm telling you." *Id.* at 04:55–5:00.

In his Declaration, Defendant states: "At some point during the questioning, the agent told me to remember what he promised to do for people that cooperate with him. He then told me that a judge would not look at me favorably because of my criminal history. He told me

5

I would do federal prison time and that I was not going to get probation. I understood him telling me that I would go to jail for twenty (20) years since I was not cooperating and telling them what I knew. It made me very afraid, and I understood that I had to keep talking to them or the judge would put me in jail for twenty (20) years. I started to tell them what I knew because I knew that was the only way they would let me go home and I could avoid the twenty (20) years in jail." Def. Decl. ¶ 21.

At this point, Defendant asked, "Do I need my lawyer?" *Id.* at 05:00–05:04. Agent Koepsell said, "It's completely up to you." *Id.* at 05:04–05:06. In his Declaration, Defendant states: "The agent told me that the only way this indictment would go away is if I talked to them. They told me to think about my son. It made me afraid again, so I asked them if I need my lawyer. They said it was up to me." Def. Decl. ¶ 22.

Defendant kept talking, raising his voice at Agent Koepsell, telling him "you want to lock me up now, right? Give me twenty thirty years." *Id.* at 05:20–05:25. Defendant said that he "thought [he] was going home today," and stated that "now [he] doesn't have money for a lawyer. *Id.* at 07:48–07:53. Agent Koepsell told Figaro that he didn't "need money for a lawyer, you get a lawyer for free." *Id.* at 07:53–07:58.

After further back and forth, Agent Koepsell told Defendant that they were "to a point that [he] could either start helping . . . the only way that [they] were going to be able to help him [was] him explaining and identifying other people . . . ." *Id.* at 09:30–09:50.

Defendant then asked to "make a phone call," stating that "you all told me I could make a phone call." *Id.* at 10:05–10:08. Defendant further reiterated his request, indicating that he had been "very polite," and when Agent Koepsell asked him who he wanted to call, Defendant said, "I would like to call my lawyer." *Id.* at 10:10–10:25. Agent Koepsell said,

6

"Okay." Defendant added that he would "still speak to y'all, I don't mind." *Id.* at 10:22–10:30. Defendant asked to use his cell phone and, Agent Koepsell requested the passcode. *Id.* In his Declaration, Defendant states: "I did not want them to have the passcode to my cell phone because I did not want them to look through my cell phone. I did not understand that I could refuse to give them my passcode. I did not think I had a choice, so I gave them the passcode to my cell phone because I thought that was the only way I could talk to a lawyer. I got very emotional and very upset." Def. Decl. ¶ 24. Defendant complied and gave the agents his passcode, but did not call a lawyer. He used the agents' landline to call his girlfriend. Def. Decl. ¶ 25.

Defendant now moves to suppress all of his oral and written statements during this interrogation. The motion does not seek relief about anything on Defendant's cellphone.

## DISCUSSION

I. Legal Standard

The Fifth Amendment protects individuals against self-incrimination and guarantees a right to counsel for custodial interrogations. *Miranda v. Arizona*, 384 U.S. 436 (1966); *see also U.S. v. Patane*, 542 U.S. 630, 636 (2004) (describing the *Miranda* rule as a "prophylactic employed to protect against violations of the Self-Incrimination Clause"). *Miranda* requires that defendants "be apprised of certain rights before a custodial interrogation my begin, including, of course, the right to remain silent and be afforded the assistance of counsel." *United States v. Plugh*, 648 F.3d 118, 125 (2d Cir. 2011). "But once those warning are properly administered," a defendant "is left to make his own choice as to how best to proceed." If a defendant invokes the right to counsel, all questioning must cease "until counsel has been made available to him, unless the accused himself initiates further communication,

exchanges, or conversations." *Edwards v. Arizona*, 451 U.S. 477, 484–85 (1981). A defendant must, however, unequivocally and unambiguously invoke the right to counsel. *See Berghuis v. Thompkins*, 560 U.S. 370, 381 (2010).

If a defendant fails to expressly invoke his *Miranda* rights, or if he invokes his rights, but subsequently expresses "a willingness and a desire for a generalized discussion about the investigation," *see Oregon v. Bradshaw*, 462 U.S. 1039, 1046 (1983), in order to admit the defendant's statement at trial, the Government must show, by a preponderance of the evidence, that the defendant "in fact knowingly and voluntarily waived *Miranda* rights when making the statement." *Berghuis*, 560 U.S. at 382; *Colorado v. Connelly*, 479 U.S. 157, 168–69 (1986). A waiver is "knowing" when a defendant speaks "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Plugh*, 648 F.3d at 127. A waiver is "voluntary" when a defendant's statements are "the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Id.*

In determining whether a defendant knowingly and voluntarily waived his *Miranda* rights, "the court must consider the totality of the circumstances surrounding the interrogation." *United States v. Medunjanin*, 752 F.3d 576, 586 (2d Cir. 2014). "[T]hese circumstances include 1) the accused's characteristics, 2) the conditions of the interrogation, and 3) the conduct of the police." *In re Terrorist Bombings of U.S. Embassies in E. Afr.*, 552 F.3d 177, 213 (2d Cir. 2008). A waiver "need not be express," *Plugh*, 648 F.3d at 127, and can be "inferred from the actions and words of the person interrogated." *North Carolina v. Butler*, 441 U.S. 369, 373 (1979). "[T]he law can presume that an individual who, with a full understanding of his or her rights, acts in a manner inconsistent with their exercise has made a deliberate choice to relinquish the protection those rights afford." *Berghuis*, 560 U.S. at 385. When "the

prosecution shows that a Miranda warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent." *Id.* at 384.

 B. Analysis

  1. Fifth Amendment Right Against Self-Incrimination

 There is no dispute that Defendant was in custody. *See Thompson v. Keohane*, 516 U.S. 99, 112 (indicating that a defendant is "in custody . . . for *Miranda* purposes," when "a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave"); *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (per curiam) (comparing custody to a "formal arrest"). Nor is there a dispute that he was subject to interrogation. *See Pennsylvania v. Muniz*, 496 U.S. 582, 600–01 (1990) (explaining that interrogation includes "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect" (quoting *Rhode Island v. Innis*, 446 U.S. 291 (1980)). The sole question is whether Defendant knowingly and voluntarily waived his *Miranda* rights. Based upon the facts alleged, as well as the recordings of the interrogation, I find that he did.

  a. Knowing and Voluntary Waiver

 Defendant argues that the government failed to establish that Defendant acknowledged he understood his rights because it has not made a showing of exactly what was said to Defendant in the hospital that constituted his *Miranda*. *See* Motion, at 7–8. Defendant also argues that the government did not a submit a *Miranda* waiver form, and that this is because Defendant never completed and signed such a form. *See id.* at 8.

To begin, Defendant's failure to sign a waiver form does not preclude a finding of waiver. As the Supreme Court has held, an *express* waiver is not required. *See Butler*, 441 U.S. at 373 ("[T]he [*Miranda*] Court did not hold that such an express statement is indispensable to a finding of waiver). While "[a]n express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver, but is not inevitable either necessary or sufficient to establish waiver." *Id.*

I find that Defendant's waiver was knowing. SA Cordova, in the presence of SAs Getz and Davi, read Defendant his *Miranda* rights at the hospital shortly before he was transported to HSI. Based upon both SA Cordova's report that Defendant acknowledged he understood each right as it was read and Defendant's own experience with arrests, Defendant had full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Plugh*, 648 F.3d at 127.

I likewise find that Defendant's waiver was voluntary. Defendant expressed a desire for counsel at the hospital. SA Cordova advised him that he would need to ask pedigree questions during arrest processing, but the agents did not engage in any subsequent questioning, repeatedly advising Defendant that he could have his questions answered by the case agent. And it was Defendant who requested to speak with Agent Koepsell. Although Defendant now argues that he did not speak voluntarily, his own statements after requesting to call his lawyer belie this argument. Defendant indicated that he would "still speak to y'all." In short, at no time did Defendant express any hesitancy about speaking with Agent Koepsell.

b. Statements A Product of Intimidation, Coercion, and Deception

Defendant argues that his statements were the product of intimidation, coercion, and deception because Agent Koepsell employed a "deliberate deceptive strategem." *See*

10

Motion, at 8–9.

The Second Circuit has repeatedly held that encouraging a suspect to cooperate does not render a confession involuntary or statements inadmissible. *See, e.g.*, *United States v. Tutino*, 883 F.2d 1125, 1138 (2d Cir. 1989) ("Once Tutino had been advised of his rights, the agents were free to discuss with him the evidence against him and the reasons why he should cooperate."), *cert. denied*, 493 U.S. 1082 (1990); *United States v. Alvarado*, 882 F.2d 645, 649–50 (2d Cir.) (finding that agent's statements that defendant had a daughter and it would be in her interest to cooperate, cooperation would be brought to judge's attention, and failure to cooperate could subject her to a 10-year prison sentence did not render confession involuntary), *cert. denied*, 493 U.S. 1071 (1989); *United States v. Pomares*, 499 F.2d 1220, 1222 (2d Cir.) (defendant "was simply informed that it would be to his benefit to cooperate" and such statements have been held to not overbear the will), *cert. denied*, 419 U.S. 1032 (1974).

Defendant relies on *Anderson*, in which the Second Circuit held that a suspect's statements were the product of coercion when the agent made similar statements about cooperating and helping the suspect. *United States v. Anderson*, 929 F.2d 96, 100–01 (2d Cir. 1991). *Anderson* is distinguishable. There, the agent did more than mislead the suspect. Unlike in *Bye*, where DEA agents advised an arrestee of his *Miranda* rights, discussed the charges and likely sentences, and advised the suspect that they welcomed his cooperation which would be more beneficial given early, in *Anderson*, nothing the *Anderson* agents said was true. *See id.* at 101 (distinguishing *United States v. Bye*, 919 F.2d 5 (2d Cir. 1990)). Critically, the *Anderson* agents put the suspect to a choice between having an attorney present or cooperating with the government. *See id.* at 100.

Nothing about Defendant's interrogation rises to the level of deceptive strategems

11

that the *Miranda* Court expressly disapproved of, such as giving false legal advice, or otherwise threatening, tricking, or cajoling a waiver of the privilege. *See Miranda*, 384 U.S. at 476. Agent Koepsell did not deceive or "misrepresent[] the nature of the defendant's rights should he get a lawyer." *See United States v. Shehadeh*, 940 F. Supp 2d 66, 69 (E.D.N.Y. 2012) (denying a motion to suppress after the agent testified that he told the defendant *while* administering *Miranda* warnings that he was giving the defendant "an opportunity to ask question before the lawyers got involved," but that "it was a limited opportunity").

Nor did Agent Koepsell discourage Defendant from invoking his right to a lawyer. When Defendant asked whether he needed a lawyer, Agent Koepsell truthfully stated that it was "up to [Defendant]." And when Defendant invoked his right to counsel, and unequivocally stated that he wanted to speak to his lawyer, Agent Koepsell said, "Okay," and no more questioning occurred, even though Defendant himself said that he would "keep talking to y'all" and that he "[didn't] mind."

Defendant acknowledged that he had been arrested many times. This was not Defendant's first custodial interrogation, and his age and experience with the criminal justice system belies the notion that he was unaware of the Miranda rights that were read to him, or of the consequences of talking to the agents. *Cf. J.D.B. v. North Carolina*, 564 U.S. 261, 273 (2011) (explaining how the law treats children differently because they "characteristically lack the capacity to exercise mature judgment and possess only an incomplete ability to understand the world around them"). Defendant was read his *Miranda* rights, acknowledged he understood them, and readily spoke with the agents thereafter.

In conclusion, I find that Defendant's Fifth Amendment right against self-incrimination was not violated.

B. Fifth Amendment Right to Counsel[1]

Defendant argues that his Fifth Amendment right to counsel was violated because he "unambiguously and unequivocally invoked his right to counsel" when he asked "do I need my lawyer?" Motion, at 13. I find that Defendant's invocation of his right to counsel was neither unequivocal nor unambiguous.

Defendant relies on *Seppala*, where a district court found that a defendant unequivocally and unambiguously invoked his right to counsel when he asked if he "[had] an opportunity to call an attorney?" *United States v. Seppala*, No. 16-CR-436, 2017 WL 5633167, at *3 (S.D.N.Y. Nov. 22, 2017). *Seppala* is not binding authority; however, I do not even find it persuasive. To the extent that the *Seppala* defendant invoked his right to counsel, there, the defendant's question at least suggested a desire to have counsel present. In contrast, here Defendant's question as to *whether he needed* an attorney does not convey such a desire.

Moreover, in *Seppala*, in response to the defendant's question, the agent responded that the defendant would be able to call a lawyer, and the defendant again asked when he could do so. *Id.* at *1. Here, Defendant did not express a desire to call an attorney merely by inquiring if he needed one, and his subsequent request to call his attorney came only after making the statements he now seeks to suppress. *Cf. Wood v. Ercole*, 644 F.3d 83, 91 (2d Cir. 2011) (finding the defendant invoked his right to counsel when he stated "I think I should get a lawyer"). Therefore, Defendant's invocation of his right was not unequivocal.

---

[1] Figaro states that his Sixth Amendment right to counsel was violated by the interrogation, but he offers no substantive arguments as to how this right was violated. The Sixth Amendment right to counsel only attaches after charges have been filed. Because Figaro had not yet been charged when the March 10, 2021 interrogation took place, his Sixth Amendment rights could not have been violated.

Where a defendant merely references a lawyer or inquires as to the potential need for one, the law does not require agents to stop their questioning. *See Davis v. United States*, 512 U.S. 452, 459 (1994) (finding agents not required to stop questioning "if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel"). "Rather, the suspect must unambiguously request counsel." *Id.* This means that "a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Id.* At best, assuming Defendant's question was an attempt to invoke his rights, such attempt was ambiguous. *See, e.g.*, *Davis*, 512 U.S. at 462 (holding that "Maybe I should talk to a lawyer" is "not a request for counsel"); *Diaz v. Senkowski*, 76 F.3d 61, 63 (2d Cir. 1996) (affirming that defendant did not invoke his right to counsel by asking officers "Do you think I need a lawyer?").

## CONCLUSION

I find that neither Defendant's Fifth Amendment right against self-incrimination nor his right to counsel was violated in the course of the interrogation. An evidentiary hearing is not required since Defendant acknowledges having been read his *Miranda* rights and speaking anyhow, and does not show an unequivocal request for a lawyer and being denied that right. Accordingly, his Motion to suppress his written and oral statements is denied. The Clerk of Court shall terminate his Motion to Suppress (ECF No. 90).

SO ORDERED.

Dated:   New York, New York                        /s/ Alvin K. Hellerstein
         October 22, 2021                         ALVIN K. HELLERSTEIN
                                                  United States District Judge